148 So.2d 229

**STATE of Alabama et al.**

v.

**SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY.**

3 Div. 940.

Supreme Court of Alabama.

Dec. 20, 1962.

MacDonald Gallion, Atty. Gen., J. Taylor Hardin, Asst. Atty. Gen., Maurice F. Bishop, Sp. Asst. Atty. Gen., J. Douglas Harris, Atty., Public Service Comm., J. M. Breckenridge, Birmingham, J. Howard McEniry, Bessemer, and Frank B. Parsons, Fairfield, for appellants.

R. E. Steiner, III, Steiner, Crum & Baker, Montgomery, Jas. A. Simpson, Lange, Simpson, Robinson & Somerville, Birmingham, and Walter R. Byars, Gen. Atty., Birmingham, Jefferson Davis, Gen. Counsel of Southern Tel. Co. and Drury B. Thompson, Atlanta, Ga., for appellee.

HARWOOD, Justice.

We are here confronted with litigation that has dragged its way through the processes of the Alabama Public Service Commission, the Circuit Court of Montgomery County, and the Supreme Court of Alabama for over eight years.

The interests of the rate payers, of the Southern Bell Telephone Company, and of the State of Alabama demand that this liti-

gation be concluded. As observed by the trial court in its decree: "Thus for over six years since the Company filed its application for increased rates, this matter is still unsettled and in litigation. The public does not know what rates it has paid for telephone service over the past six years, nor indeed the price it is now paying. The utility does not know what earnings can be depended upon for the past six years on its operations in Alabama, during which time substantial expansion of its plant and facilities has been undertaken, nor does it yet know what return on its investment in Alabama might be expected from its present business or for its future plans."

Section 52, Title 48, Code of Alabama 1940, pertaining to the fixing of rates of public utilities by the Public Service Commission provides:

"Rates and charges shall be just and reasonable as to utility and public.— The rates and charges for the services rendered and required shall be reasonable and just to both the utility and the public. Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service. In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration, among other things, to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plans, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service."

Adding some substance in a highly general way to the above provision, Section 319 of Title 48, Code of Alabama 1940, in determining the valuation of the property of a utility, the Commission "shall give due consideration to the history and development of the utility and its property, original cost, cost of reproduction, as a going concern, and other elements of value recognized by the laws of the land for rate-making purposes."

As we interpret the above statutes, their effect is to have our Public Service Commission determine utility rates under the theory of a fair rate of return based upon a fair and adequate rate base, as distinguished from the so-called "cost of capital" theory for determining the rate of return.

The "cost of capital" theory treats capital charges as a cost of furnishing the public utility service and includes an allowance on debt capital plus any additional return considered necessary to attract investment to the enterprise. The fair rate of return is therefor the composite of an interest rate for debt capital, a figure arrived at without difficulty, and an earning rate for equity capital sufficient to create a fair rate of return when considered together with the cost of debt capital. See The Bell Telephone System Rate Cases, 37 V.L.R. 699.

Under the rate base theory of determining a fair rate of return, the rate base is the valuation placed on the utility property.

Prior to World War II most of the cases dealing with utility rates were concerned with methods of valuation. The "cost of capital" theory tended to shove this question into the background, though inherent in both theories was the problem of a proper debt-equity ratio in the capital structure of the company.

As before stated, the cost of debt capital usually presents little difficulty, being historical, or at least within probable range of calculation if for the future.

The cost of equity capital is the amount of earnings that should reasonably result from the funds represented by common

stock. Unlike bonds, common stock does not contractually provide for the payment of a specific rate of return, and dividends may or may not be paid. This risk element naturally calls for a higher contemplated rate of return by the investor on the equity capital (common stock).

The less the amount of debt in the debt-capital structure, the larger the amount that must be allowed to insure a fair rate of return.

The ideal capital structure would allow a debt-equity ratio in amounts that the company would get its full benefit in the amount of debt capital, and yet not have the debt component so high as to discourage prudent investors. This ideal capital structure is not static. However, many commissions and courts for rate making purposes, have concluded that a debt-equity ratio of 45% debt-55% equity most nearly approximates a proper debt-equity ratio.

In Southern Bell Telephone and Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372, that court observed:

"Since the decision of the United States Supreme Court in the case of Federal Power Commission v. Hope Natural Gas Co., supra, the hypothetical 45% debt ratio rule has been almost universally adopted in those states where there is no formula prescribed by constitutional provisions or statutes for the determination of a rate base. In addition to the approval of this formula by us it has been held valid by the courts in the states of Massachusetts,[1] New Hampshire,[2] Vermont,[3] Maryland,[4] Mississippi,[5] New Mexico,[6] Idaho,[7] and Pennsylvania.[8] It has likewise been adopted by the commissions in the States of Tennessee,[9] Connecticut,[10] South Dakota,[11] Utah,[12] Texas,[13] Nebraska,[14] Illinois,[15] Alabama,[16] and in the District of Columbia [17]."

In the order of the Commission now before us, the rate base has been determined, and the Commission has used a debt-equity ratio of 35–65, as contended for by the Company. In doing so the Commission departed from its findings and order of 1954 considered on the first appeal of this case (Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co., 253 Ala. 1, 42 So.2d 655).

1. New England Telephone & Telegraph Co. v. Massachusetts Department of Public Utilities, 331 Mass. 604, 121 N.E.2d 896, 6 P.U.R.3d 65.

2. New England Telephone & Telegraph Co. v. State, 98 N.H. 211, 97 A.2d 213, 99 P.U.R.,N.S., 111.

3. Re New England Telephone & Telegraph Co., 116 Vt. 480, 80 A.2d 671, 90 P.U.R., N.S., 414.

4. Chesapeake & Potomac Telephone Co. of Baltimore City v. Public Service Commission, 201 Md. 170, 93 A.2d 249, 97 P.U.R.,N.S., 50.

5. Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, supra.

6. State Corporation Commission v. Mountain States Telephone & Telegraph Co., 58 N.M. 260, 270 P.2d 685, 4 P.U.R.3d 33.

7. Petition of Mountain States Telephone & Telegraph Co., 76 Idaho 474, 284 P.2d 681, 8 P.U.R.3d 265.

8. Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission, 186 Pa.Super. 1, 140 A.2d 114, 24 P.U.R. 3d 9.

9. Re Southern Bell Tel. & Teleg. Co., 100 P.U.R.,N.S., 33.

10. Re Southern New England Telephone Company, 20 P.U.R.3d 34.

11. Northwestern Bell Telephone Company, 20 P.U.R.3d 385.

12. Re Mountain States Telephone & Telegraph Company, 2 P.U.R.3d 75.

13. Re Southwestern Bell Telephone Company, 2 P.U.R.3d 265.

14. Re Northwestern Bell Telephone Company, 97 P.U.R.,N.S., 394.

15. Re Illinois Bell Telephone Company, 7 P.U.R.3d 493.

16. Re Southern Bell Telephone & Telegraph Co., 4 P.U.R.3d 195.

17. Chesapeake & Potomac Telephone Co., 6 P.U.R.3d 222.

The Commission in its first order in 1954, adopted, among other factors, a debt-equity ratio of 45–55, and a "net investment rate base." In its orders now under review, the Commission in addition to changing the debt-equity ratio component from 45–55 to 35–65, adopted a "reasonable value rate base", the latter base concededly being more favorable to the Company than the former "net investment rate base."

As before stated, the rate base as determined by the Commission was confirmed by the lower court, and is not an issue in this appeal except in the aspect as to return on equity capital. We adverted to this matter in order to dispel any conclusion that this court has by its opinion in the first appeal in this case (253 Ala. 1, 42 So.2d 655), laid down as a mathematical requirement that the debt-ratio of 35–65 must under all circumstances be adhered to. While the question of debt-equity ratio is one for management, its impact substantially affects the manner and cost of obtaining capital, and is therefore an important factor in the rate of return. The fixing of a fair rate of return is exclusively within the jurisdiction of the legislature, or its agency, the Public Service Commission. This court's province is only to determine whether the rate of return fixed by the Commission is within the statutory requirement of being fair to the Company. As aptly stated by the Supreme Court of Massachusetts in New England Telephone & Telegraph Co. v. Dept. of Public Utilities, 331 Mass. 604, 121 N.E.2d 896, 6 P.U.R.3d 65 (1954):

"As a matter of internal management, the company's directors had the right to determine upon the reduction in indebtedness. Indeed, the department's very decision declares that the primary duty of the directors was to exercise their own best judgment of what was best for the company, and intimates by indirection that they did so. The directors did not have to abdicate their own business judgment and to ingest the department's opinion or else be denounced as contumacious.

But * * * debt structure and the percentages of debt and equity capital enter vitally into the determination of the amount which the consuming public should pay. A 35% debt ratio might be deemed in the nature of a company luxury not to be reflected in rates to be charged the public. In any event, the department could think so without our being able to adjudge that there is anything unlawful or confiscatory about its position."

We have examined the 80 odd citations of cases and commission order set forth in an appendix to the Company's brief showing rates of return on equity capital. In all but two instances where the debt-equity ratio was commented upon, the courts and commissions used a debt-ratio in excess of the "historical debt-equity ratio" of $1/3$–$2/3$ which the Company contends is now its right.

We have written to this element of capitalization in determining the base rate since it will of necessity be influential in our considerations as to whether the order of the Alabama Public Service Commission now under review affords a fair rate of return, or its corollary whether the rate of return is confiscatory.

The base rate fixed by the Public Service Commission in its order of December 8, 1959, which is now being reviewed, the Commission fixed the reasonable value base rate as follows:

| Test Period or Date | Reasonable Value as Determined by Commission |
| --- | --- |
| 3rd Quarter 1954 annualized | 97,352,778 |
| Av. for 12 mos. ended 9–30–55 | 102,347,821 |
| Av. for 12 mos. ended 9–30–56 | 113,129,619 |
| Av. for 12 mos. ended 9–30–57 | 132,503,918 |
| Av. for 12 mos. ended 9–30–58 | 146,459,146 |
| As at 9–30–58 | 153,319,485 |

In the order of the Commission of 21 April 1954, the rate base was determined, among other factors on "net investment," and a debt-equity ratio of 45–55%.

In its decision of 24 July 1958 (Alabama Public Service Commission and State of Alabama v. Southern Bell Telephone and Telegraph Company, 268 Ala. 312, 106 So. 2d 163) this court had before it an order of the Public Service Commission dated 21 April 1954, wherein the Commission denied the Company's petition for an increase in rates. The Company had taken an appeal to the Circuit Court of Montgomery County, and that court had entered an order substantially agreeing with the Company's position.

In that appeal this court concluded that both the Commission and the Circuit Court of Montgomery County had erred in fixing the rate of return, in that the Commission had erred in excluding the cost of reproduction as one of the essential factors in arriving at the rate base, and the Circuit Court had erred in holding, in effect, that the cost of reproduction less depreciation was the controlling element in fixing the reasonable value of the Company's property. It was the view of this court that under the provisions of Sec. 52, supra, both the "net investment less depreciation" and the "cost of reproduction less depreciation" are factors that must be accorded consideration in determining the reasonable valuation of the Company's property.

The court further observed that on remandment probably additional testimony would be taken concerning a fair rate of return on the "reasonable value" of the Company's property ascertained in accordance with the opinion of the court. The court further stated:

"* * * However, we think it advisable to observe that approval of the rate of return of 6⅔% in the 1949 rate case (253 Ala. 1, 42 So.2d 655, supra) was based on the evidence in that particular case. What was there said cannot be taken as requiring a rate of re-

turn of 6⅔%, neither more nor less, in every case. An appropriate rate of return necessarily will vary, depending upon the particular conditions and factors in each case."

This court also, as a guide to the Commission on remandment to it, excerpted the following from Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333:

"We held in Federal Power Commission v. Natural Gas Pipeline Co., supra [315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037] that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' Id., 315 U.S. at page 586, 62 S.Ct. at page 743. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act [Natural Gas Act of 1938]. * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. * * *"

Upon remandment further hearings were held by the Commission, and upon such hearings the Commission entered its order of 8 December 1959. In this order the Commission revised several of the components of the formula by which it had determined the rate base in its order of 21 April 1954, all of such revisions being substantially in accord with the contentions of the Company. This was within the province of the Commission.

Under the formula adopted in its order of 8 December 1959, the component of return on equity capital was arrived at by the Commission by giving consideration to the earnings price ratio of Moody's 24 pub-

lic utilities as reflected in the testimony of Dr. Dorau, a witness for the Company, and by adding thereto 5% to cover cost of financing and market pressure. By this method the Commission allowed a return on equity capital as follows:

| Year | Earnings Price Ratio | Addition of 5% for Cost of Financing & Pressure | Indicated Cost of Equity Capital as Adjusted |
|------|------|------|------|
| 1955 | 6.49 | .33 | 6.82 |
| 1954 | 6.32 | .32 | 6.64 |
| 1956 | 6.70 | .34 | 7.04 |
| 1957 | 6.80 | .34 | 7.14 |
| 1958 | 6.16 | .31 | 6.47 |

The net result of such allowance for cost of equity capital, when considered with the other components of the rate base, was to provide for a rate of return.

> 1954—5.48
> 1955—5.33
> 1956—5.61
> 1957—5.77
> 1958—5.42

The Commission further determined that the fair rate of return on future operations would be 5.57%, the increase of .05% as to future return resulting from increased cost of debt capital.

On appeal to the Circuit Court by the Company the findings and order of the Commission was affirmed in every respect except as to the item of "cost of equity capital." As to this item, the order of the Circuit Court is as follows:

"Applying 8.5% as the allowance for the equity component of the rate of return and utilizing the capital structure adopted by the commission and the allowance for the debt component found by the commission, simple arithmetical calculations show the following rates of return to be the lowest which can be supported by the evidence of record:

```
1954 Common Equity – 65% at 8.50% -------------- 5.5250%
 Debt – 35% at 2.80 -------------- 1.0430
 6.57

1955 Common Equity – 65% at 8.50 -------------- 5.5250
 Debt – 35% at 2.90 -------------- 1.0150
 6.54

1956 Common Equity – 65% at 8.50 -------------- 5.5250
 Debt – 35% at 2.96 -------------- 1.0360
 6.56

1957 Common Equity – 65% at 8.50 -------------- 5.5250
 Debt – 35% at 3.22 -------------- 1.1270
 6.65

1958 Common Equity – 65% at 8.50 -------------- 5.5250
 Debt – 35% at 3.47 -------------- 1.2145
 6.74

 6.61 Average rate
 of return

As of 9/30/58 (For Future)
 Common Equity – 65% at 8.50 -------------- 5.5250
 Debt – 35% at 3.91 -------------- 1.3685
 6.89

 6.65 Average rate
 of return"
```

██ It should be remembered that the decree of the Montgomery Circuit Court reaches us with no presumption of correctness in view of the fact that the appeal to that court was on the record established before the Alabama Public Service Commission and no additional evidence was adduced in the trial court. Code of Alabama 1940, Tit. 48, Sec. 82. Smith Transfer Co. v. Alabama Public Service Commission, 271 Ala. 177, 123 So.2d 28.

The lower court in its decree observed that the Commission found in its April 21, 1954 order that the "weight of the evidence" required 8.5% for equity capital and that the witnesses, including the Commission's witnesses, were unanimous that 8.5% for equity "is the lowest figure that the facts will support."

With reference to the mere mathematical figure of 8.5%, the lower court was correct in its view, but from witnesses appearing before the Commission in 1954, and the factors which most certainly the Commission in its 1959 order took into consideration leads us to the conclusion that this mere mathematical figure demands a closer scrutiny than was given it in the lower court's order.

In the Commission's 1954 order the rate base was "net investment" and the debt-equity capitalization was based on a 45–55%. Then, too, at the 1954 hearing one of the expert witnesses (Hawkes) in using the figure 8.5% for equity capital, based his opinion upon the "net investment" and an assumption that the proper equity-debt ratio was to be 45–55%.

The Alabama Public Service Commission in its 1959 order departed from the "net investment rate base" in deference to and in conformity with our decision in Alabama Public Service Commission v. Southern Bell Telephone and Telegraph Co., 268 Ala.

312, 106 So.2d 163, and gave consideration to all of the factors and elements specified in Tit. 48, Sec. 319, Code of Alabama 1940, and adopted the "reasonable value rate base" which was concededly well above the "net investment rate base."

Of necessity, and because of the many factors which vary with time, the cost of equity capital cannot properly be reduced to a valid mathematical certainty, nor should the fixing of the cost of equity capital be reduced to an exact mathematical certainty if such figure is to be combined with an established rate base, when such combination would bring about an unrealistic end result. The realistic end result sought is a fair rate of return.

In the words of Dr. Herbert Dorau, a leading witness for the Company:

"The determination of the cost of common stock capital is not reduceable to any standard mathematical formula or procedure because the responsible treatment of the same evidence of the cost of common stock capital, such as earnings-price ratios and dividend yields, necessarily vary with economic circumstances of the time and place and most particularly with the shifts from pessimism to optimism."

It should be noted that despite this profession of difficulty this witness did give as his expert opinion that the Commission should have allowed a cost of equity capital of 8.5%. In arriving at this figure this witness accompanied his testimony by a prepared statement of some seventy-seven pages, mostly charts and computations. The elements going into formulation of his conclusion were:

. "Earnings-price ratio and dividend yields."

. "Record bull market."

. "Proportion of earnings paid out as dividends."

. "Difference between explicit and implicit dividend rates."

"2½% for cost of financing and 7½% for market pressure."

"Our political economy has 'built in' pressures * * *."

Under the lower court's decree the return on equity capital was treated as constant during the 1954–58 test periods here involved. If projected in the future such figure would result in a rate of return of 6.89%, a figure in excess of the rate of return now existing under the supersedeas bond.

As to the relation of the cost of equity capital to a fair rate of return, Dr. Dorau testified that the cost of equity capital was not synonymous with a fair rate of return.

He further testified that factors determining a fair rate of return, other than the cost of capital, could be given effect "by the application of informed economic judgment. Most of these factors are not susceptible of precise statistical measurement or reduction to mathematical formulae and some of them overlap."

Dr. Dorau further testified that "the evaluation of the elements of fair rate of return is a function in which good judgment as well as arithmetic should be applied to bring about an equitable economic result." From his charts, calculations and interpretations thereof, this witness stated that in his opinion a fair rate of return to the Company would be not less than 7.40% as of December 31, 1958, a 7.15% for the five year period.

In his book "A Telephone Rate Case" we find E. D. Smith making the following observations:

"What will constitute a fair return in a given case is not capable of exact mathematical demonstration. It is a matter more or less of approximation, about which conclusions may differ; and what annual rate will constitute just compensation depends on many circumstances and must be determined

by the exercise of a fair and enlightened judgment, having regard to all relevant facts. In a confiscation case this determination must be made by the court on its own independent judgment of the law and the facts.

"In making this determination two tests of adequacy have been applied.

"First it is said that a public service company is entitled to such rates as will permit it to earn a return on the fair value of the property which it employs for the convenience of the public equal to that return generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; and second, that the return should be reasonably sufficient to insure confidence in the financial soundness of the company, and should be adequate under efficient and economic management to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

■ The above, we think, demonstrates the difficulties confronting the court in the determination of a rate case. The record in such a case is abundant with the testimony of experts who demonstrate their conclusions by varied formulae and computations. The ultimate question of a fair rate of return should not be a composite of the results mechanically reached by these formulae, with little regard given to the question sought to be determined, that is, the fair rate of return.

■ After a study of the evidence, exhibits, and the briefs submitted in this appeal, it is our conclusion that the rate of return allowed by the Public Service Commission test periods 1954–58, which averages 5.52% is too low, and would not meet the statutory requirement of a fair rate of return, and it is further our conclusion

that the rate of return resulting from the court's allowance of 8.5% for the equity component when used in conjunction with the capital structure adopted by the Commission and the lower court, and resulting in an average rate of return of 6.65% for the test period above mentioned, is too high.

In the briefs filed in this cause our attention is called to the case of Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372, wherein we find the following set forth:

"Raymond A. Nolan (a company witness) testified as to the rate of return to Southern Bell in eight southern states as follows:

| | % |
|---|---|
| "Alabama | 6.87 |
| "Florida | 6.86 |
| "Georgia | 6.32 |
| "Kentucky | 5.92 |
| "Mississippi | 6.19 |
| "North Carolina | 6.86 |
| "South Carolina | 6.34 |
| "Tennessee | 5.56 |
| | 50.92 |
| 8/ | 50.92 |

"Mesne average of foregoing ____ 6.36

"Since the testimony of Mr. Nolan was adduced, the Supreme Court of Mississippi, in the case of Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, 113 So.2d 622, has reduced the rate of return in Mississippi to the range of 4.96% to 5.08%. Accepting the former figure and reducing 6.19% to 4.96%, would reduce the foregoing mesne average from 6.36% to 6.21%."

The Company contends that the figure of 6.87% is not a correct reflection of the rate of return in Alabama, as this figure represents the rate of return in effect under the supersedeas bond. We are in accord with this contention.

We realize, of course, the rates of return in these other southern states have been arrived at by formulae which differ in components from those used by the Company in determining the rate base in Alabama. So far as we can tell, however, none of these different components would result unfavorably to the Company under the formulae used by the Alabama Public Service Commission. For instance the rate basis in several of the above mentioned states was determined with a debt equity ratio of 45–55, whereas the Alabama Commission allowed a debt equity ratio of 35–65.

The most analogous case factually that we have found to the situation in Alabama is Re Diamond State Telephone Co., 21 P.U.R.3d 417. In the above case the rate base was determined by the fair value of the company's property, the components used being: The net value of the telephones in service (less depreciation), plus telephone plants under construction, plus property held for future telephone use, plus materials and supplies, plus the cash working capital allowance, at a debt equity ratio of 35.65%. The Delaware statute provided that the fair value of the utility was to be arrived at by determining the fair value of the property by every fact, matter, or thing which had any bearing on such value; that the Commission was to look to, among other things, the original cost of construction, particularly with reference to the amount expended in permanent improvements; the market value of bonds and stocks; the probable earning capacity under rates proposed by the Commission; the expenditures for obsolete equipment; historical development; reproduction costs; developmental and going concern value; and any other elements of value. The Delaware Commission determined cost of debt to be 4.3% and the cost of equity capital 7.2%, *and the fair rate of return to be 6.19%.*

Furthermore, since the fair rate of return in Alabama is the answer we are seeking, it is logical that the above shown Alabama rate should be considered in any event.

It is also to be noted that the Supreme Court in the case of Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, 237 Miss. 157, 113 So.2d 622, found that a return in the range of 4.96% to 5.08% on the reasonable value of the Company's intrastate property was not confiscatory, though such rate of return might appear to be low, as compared with the rates allowed in other states in which the Company operates. It is to be noted the range represented by the rate of reutrn allowed in Mississippi is substantially below the average rate of return of 5.52% allowed for the test periods under the 1958 order of the Commission.

Our statute, Section 52, supra, provides that the rates and charges for services rendered and required shall be reasonable and just to both the utility and the public, and that the uitlity shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will under efficient management earn a fair net return on the reasonable value of its property devoted to the public service.

Certainly as to the rate of return for the test periods, the Commission and the courts have had the advantage of historical figures and experience, whereas the rates which were allowed for the future of necessity had to be based on estimates of criteria furnished by the past. As stated in West Ohio Gas Co. v. Public Utilities Commission of Ohio, 294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773:

> "But prophecy, however honest, is generally a poor substitute for experience. 'Estimates for tomorrow cannot ignore prices of today.'"

Obviously for the period between the date of the decree of the lower court and the time when this proceeding again reaches the Public Service Commission, the rates for the future set by the Public Service

Commission will have a basis of factual experience rather than estimation.

Upon consideration of all the evidence presented in the proceedings below, and the arguments contained in the respective briefs, it is our conclusion that a rate of return of not less than 6.20% would be a fair rate of return for the test period 1954–58, and that the cost of equity capital should be so adjusted that the end result would be a return of 6.20% on the property rate base as found in the proceedings below, and which is not now and here in controversy.

■ Although the question of a fair rate of return to the Company from the date of the decree of the lower court to the date of this opinion is not before this court, the rates collected during this period have been collected under supersedeas. In an effort to bring to a close this protracted litigation, we will assume that during the period hereinabove mentioned that there has been no such change of conditions as to make the rate of return of 6.20% inappropriate for this period. However, we are fully aware that the matter of earnings from the date of the decree of the lower court is a matter which addresses itself to the Public Service Commission, and it is for that body to determine the rate of return beyond the date of the decree of the lower court.

This opinion is not intended to prevent the Public Service Commission, at its own instance, or the utility to request a hearing under the applicable statutes regarding the rate of return for any period subsequent to the date of the test periods. Our only conclusion, with reference to this period of time, is that unless substantial changes have occurred that would affect either the rate payer or the utility, this litigation might be brought to a conclusion and that all matters affecting both the utility and the public be put at rest up to and including the date of this opinion.

The decree below is due to be affirmed in part, reversed in part and remanded to the Alabama Public Service Commission for further proceedings in accordance with this opinion. In the meantime, the supersedeas order and the bonds made pursuant thereto, as required by law, shall continue in full force and effect until final disposition of this cause.

Affirmed in part, reversed in part, and remanded to the Alabama Public Service Commission for proceeding in compliance with this opinion.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.

